## CASE NO. 24-1076

# IN THE

# 𝕌nited 𝕊tates ℂourt of 𝔸ppeals

## FOR THE FOURTH CIRCUIT

––––––––––––––––––––

COLBY WILLIAM CROSBY,

as the Personal Representative of the Estate of William Jerry Crosby,

*Plaintiff-Appellant,*

v.

COLLETON COUNTY SHERIFF'S OFFICE;
SHERIFF GUERRY BUDDY HILL, in his official capacity;
JACOB SCOTT, individually,

*Defendant-Appellees.*

––––––––––––––––––––

On Appeal From The United States District Court
For The District Of South Carolina At Charleston

––––––––––––––––––––

## OPENING BRIEF OF APPELLANT

––––––––––––––––––––

W. Mullins McLeod, Jr.
McLEOD LAW GROUP, LLC
3 Morris Street, Suite A
Charleston, SC 29403
843-277-6655
mullins@mcleod-lawgroup.com

Nicholas A. Charles
McLEOD LAW GROUP, LLC
1518 Richland Street
Columbia, SC 29202
803-451-6057
nick@mcleod-lawgroup.com

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _24-1076_      Caption: _Colby Crosby v. Colleton County Sheriff's Office, et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Colby William Crosby, as the Personal Representative of the Estate of William Jerry Crosby_
(name of party/amicus)


_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.      Does party/amicus have any parent corporations?  ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:


3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s Nicholas A. Charles                    Date:    February 1, 2024

Counsel for: Appellant

- 2 -

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF ISSUES ....................................................................1

STATEMENT OF THE CASE................................................................2

    I.    Nature of the Case .................................................................2

    II.   The Crosby Family ..............................................................3

    III.  Deputy Scott's Killing of Jerry...........................................4

    IV.  The CCSO's Failure to Train Its Deputies ..........................12

    V.   Procedural History ...............................................................14

SUMMARY OF ARGUMENT ...............................................................15

STANDARD OF REVIEW ....................................................................17

ARGUMENT ........................................................................................18

    I.    Scott violated Jerry's constitutional rights by making purported "emergency" warrantless entries despite lacking any objective signs that an emergency existed ..............................................18

        A.   The Court should reverse the summary judgment because genuine issues of material fact exist when the evidence is viewed in the light most favorable to the Estate.............................19

            i.    The emergency aid exception does not justify any of Scott's warrantless entries into the river house .......................20

i

ii.    Scott entered the river house five times and conducted a Fourth Amendment search each time ........................................29

iii.   Scott's unlawful entries were a proximate cause of Jerry's death ..............................................................................32

B.    Even if the evidence is viewed in the light most favorable to Scott, his warrantless entries were objectively unreasonable...........34

II.    A reasonable jury could find that Jerry's actions in picking up the snake gun to defend his home from a nocturnal intruder, but not pointing the gun at the intruder, did not justify Scott's use of deadly force .............................................................................36

III.   Scott is not entitled to qualified immunity because genuine questions of material fact exist regarding the reasonableness of his actions, and Scott cannot prove Jerry's rights were not clearly established ..............................................................................44

IV.    A reasonable jury could find the CCSO and Sheriff Hill liable under *Monell* because Jerry's death was a highly predictable consequence of their failure to train CCSO deputies on welfare checks and the emergency aid exception ...................................47

CONCLUSION ..............................................................................51

REQUEST FOR ORAL ARGUMENT ..................................................51

CERTIFICATE OF COMPLIANCE ......................................................53

# TABLE OF AUTHORITIES

## Cases

*Bailey v. Kennedy*,
   349 F.3d 731 (4th Cir. 2003) ........................................................ 23, 24, 35, 46

*Bauer v. Lynch*,
   812 F.3d 340 (4th Cir. 2016) ............................................................................ 1

*Bd. of the Cty. Comm'rs of Bryan Cty. v. Brown*,
   520 U.S. 397 (1997) ................................................................... 48, 49, 50

*Betton v. Belue*,
   942 F.3d 184 (4th Cir. 2019) ........................................... 18, 38, 45, 47

*Booker v. S.C. Dep't of Corr.*,
   855 F.3d 533 (4th Cir. 2017) ......................................................... 45, 46

*Brigham City v. Stuart*,
   547 U.S. 398 (2006) ..................................................................... *passim*

*Caniglia v. Strom*,
   593 U.S. 194 (2021) ..................................................................... 18, 46

*City of Canton v. Harris*,
   489 U.S. 378 (1989) ............................................................ 48, 49, 50, 51

*Cooper v. Sheehan*,
   735 F.3d 153 (4th Cir. 2013) ..................................................... 38-39

*Dash v. Mayweather*,
   731 F.3d 303 (4th Cir. 2013) ........................................................... 18

*Florida v. Jardines*,
   569 U.S. 1 (2013) ..................................................................... 18, 31, 32

*Front Row Motorsports, Inc. v. DiSeveria*,
   No. 3:22-CV-00138-SCR, 2023 WL 5620757 (W.D.N.C. Aug. 30, 2023) ....... 29

*Graham v. Connor*,
   490 U.S. 386 (1989) ....................................................................... 37

*Hope v. Pelzer*,
   536 U.S. 730 (2002) ....................................................................... 46

*Hudson v. Michigan*,
547 U.S. 586 (2006) ........................................................................... 32

*Jenkins v. Medford*,
119 F.3d 1156 (4th Cir. 1997) ........................................................... 17

*Jones v. United States*,
357 U.S. 493 (1958) ........................................................................... 20

*Kane v. Lewis*,
604 F. App'x 229 (4th Cir. 2015) ...................................................... 32

*Kentucky v. King*,
563 U.S. 452 (2011) .................................................................... *passim*

*Knibbs v. Momphard*,
30 F. 4th 200 (4th Cir. 2022) ....................................................... *passim*

*Livingston v. Kehagias*,
803 F. App'x 673 (4th Cir. 2020) ...................................................... 45

*Mellen v. Lane*,
659 S.E.2d 236 (S.C. Ct. App. 2008) ................................................ 34

*Meyer v. McGowan*,
No. 216CV00777RMGMGB, 2018 WL 4941134 (D.S.C. July 31, 2018),
*report and recommendation adopted*, No. 2:16-CV-00777-RMG,
2018 WL 4300121 (D.S.C. Sept. 10, 2018) ...................................... 24

*Michigan v. Fisher*,
558 U.S. 45 (2009) ..................................................................... *passim*

*Mincey v. Arizona*,
437 U.S. 385 (1978) ........................................................................... 21

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1978) ...................................................................... 3, 48

*Owens v. Baltimore City State's Att'ys Off.*,
767 F.3d 379 (4th Cir. 2014) ............................................................ 45

*Paroline v. United States*,
572 U.S. 434 (2014) ...................................................................... 32-33

*Payton v. New York*,
   445 U.S. 573 (1980) ........................................................ 19

*Pena v. Porter*,
   316 F. App'x 303 (4th Cir. 2009) .................................... 39

*Ray v. Roane*,
   93 F. 4th 651 (4th Cir. 2024) .......................................... 44

*Riddick v. Sch. Bd. of City of Portsmouth*,
   238 F.3d 518 (4th Cir. 2000) .......................................... 48

*Small v. Pioneer Mach.*,
   494 S.E.2d 835 (S.C. Ct. App. 1997) ........................ 34, 43

*Smith v. Hampton Training Sch. for Nurses*,
   360 F.2d 577 (4th Cir. 1966) .......................................... 17

*Stanton v. Elliott*,
   25 F. 4th 227 (4th Cir. 2022) .............................. 36, 37, 44

*State v. Rye*,
   651 S.E.2d 321 (S.C. 2007) ...................................... 26, 40

*Staub v. Proctor Hosp.*,
   562 U.S. 411 (2011) ........................................................ 32

*United States v. Bustamante-Martinez*,
   697 F. App'x 244 (4th Cir. 2017) ...................... 24, 35, 46

*United States v. Curry*,
   965 F.3d 313 (4th Cir. 2020) .......................................... 21

*United States v. Dunn*,
   480 U.S. 294 (1987) .................................................. 30, 31

*United States v. Graham*,
   686 F. App'x 166 (4th Cir. 2017) .................................... 20

*United States v. Moss*,
   963 F.2d 673 (4th Cir. 1992) .................... 21, 23, 24, 35, 46

*United States v. Murphy*,
   35 F.3d 143 (4th Cir. 1994) ............................................ 29

*United States v. Troop*,
    514 F.3d 405 (5th Cir. 2008) ............................................................... 24, 27, 35

*United States v. Turner*,
    650 F.2d 526 (4th Cir. 1981) ............................................................... 22

*United States v. Yengel*,
    711 F.3d 392 (4th Cir. 2013) ............................................................... 21, 22

*Welsh v. Wisconsin*,
    466 U.S. 740 (1984) ............................................................................. 20, 21

*Wilson v. Prince George's Cty.*,
    893 F.3d 213 (4th Cir. 2018) ............................................................... 18

## Statutes

28 U.S.C. § 1291 ...................................................................................... 1
28 U.S.C. § 1331 ...................................................................................... 1
42 U.S.C. § 1983 ...................................................................... 1, 2, 17, 48, 49

## Constitutional Provisions

U.S. Const. amend. II ................................................................. 19, 26, 33, 40
U.S. Const. amend. IV ........................................................................... 26
S.C. Const. art. I, § 10 ....................................................................... 18, 26

## Other Authorities

Fed. R. Civ. P. 56 .................................................................................... 18
Restatement (Second) of Torts § 442A (1965) ........................................ 33

## JURISDICTIONAL STATEMENT

This case arises under 42 U.S.C. § 1983. The district court had subject matter jurisdiction under 28 U.S.C. § 1331. On December 27, 2023, the district court granted summary judgment for the defendants on each of the plaintiff's civil rights claims arising under 42 U.S.C. § 1983 and remanded the plaintiff's claims arising under state law to state court. JA1127-1147. The district court's order was therefore a final decision reviewable by this Court under 28 U.S.C. § 1291. On January 16, 2024, the plaintiff timely appealed the district court's order. JA1148. Because this is an appeal from a final judgment and the district court granted the defendants' summary judgment motion but denied the plaintiff's corresponding summary judgment motion, this Court also has jurisdiction to review the district court's denial of the plaintiff's summary judgment motion. *See Bauer v. Lynch*, 812 F.3d 340, 351 (4th Cir. 2016).

## STATEMENT OF ISSUES

I.      Whether the district court erred in granting the defendants' motion for summary judgment, and denying the Estate's motion for summary judgment, on the Estate's unlawful claim where no reasonable officer could believe a genuine emergency existed requiring immediate entry to render emergency aid.

II.      Whether the district court erred in granting the defendants' motion for summary judgment on the Estate's excessive force claim despite genuine issues of

material fact regarding whether Deputy Scott's use of deadly force was constitutionally reasonable.

III.    Whether the district court erred in concluding Deputy Scott was entitled to qualified immunity as to the Estate's unlawful entry and excessive force claims.

IV.    Whether the district court erred in granting the defendants' motion for summary judgment on the Estate's *Monell* claim against the Colleton County Sheriff's Office and Sheriff Guerry "Buddy" Hill based on their failure to train deputies on welfare checks and deputies' authority to enter a home under exigent circumstances to render emergency aid.

## STATEMENT OF THE CASE

### I.    Nature of the Case

The Estate of William Jerry Crosby filed this lawsuit asserting several claims against the Colleton County Sheriff's Office ("CCSO"), Sheriff Guerry "Buddy" Hill, and CCSO deputy Jacob Scott arising from Scott's killing of Jerry Crosby in the bedroom of Jerry's river house on May 1, 2022.  Pursuant to 42 U.S.C. § 1983, Plaintiff asserted claims against Scott for unlawful entry and excessive force and

asserted a claim against the CCSO and Sheriff Hill for *Monell*[1] liability based primarily on their failure to train CCSO deputies.[2] *See generally* JA12-30.

## II.   The Crosby Family

Jerry Crosby was a prominent, well-respected businessman in Walterboro and the South Carolina Lowcountry. *See* JA325. He was married to Donna Crosby for 37 years, and he and Donna had three children: sons Colby ("Cole") and Ryan and daughter Dondi. *See* JA332. Jerry was president of the family business, Wildwood Contractors, Inc., where he worked with both of his sons. JA332, JA335-337. Under Jerry's leadership, Wildwood Contractors completed many high-profile projects. JA332, JA335-337. Jerry and Donna also owned and operated The Forks General Store in Walterboro, and Jerry and his lifelong best friend owned Walterboro Rental and Equipment. JA332, JA338-340, JA347. In addition, Jerry served on the board of trustees for Coastal Electric Cooperative. JA332, JA347. Jerry spent much of his spare time tending to a horse farm with Dondi, who is a professional barrel racer, and traveling with Dondi to barrel races around the Southeast and beyond. JA348-349, JA341-342, JA352-355.

---

[1] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

[2] Because the district court remanded the state-law claims, those claims are not subjects of this appeal.

3

### III.  Deputy Scott's Killing of Jerry

On May 1, 2022, Donna Crosby called 911 and requested that police check on Jerry at his river house on Perkins Path near Jacksonboro, South Carolina.  JA358. As a result of the 911 call, a CCSO dispatcher issued the following notes (the "CAD notes") to a deputy in the field via the computer-assisted dispatch ("CAD") system:

> New CFS – CLR IS REQ A WELFARE CHECK ON HER HUSBAND
> SHE ADV AROUND 5-530 HE SAID HE WOULD HARM HIMMSELF [sic]
> CLR ADV HE HAS SAID THIS BEFORE IN THE PAST
> CLR ADV HE HASNT BEEN HIMSELF LATELY
> RESD IS LARGE 2 STORY RIVER HOUSE BROWN IN COLOR W CREME TRIM
> SUSP DRIVES A WHITE GMC TRUCK
> SHE ADV THE NEIGHBOR ADDRESS IS 341 PERKINS PATH
> HIS HOUSE IS ON THE RIVER
> CLR ADV EARLIER TODAY HE LEFT TO GO TO THE RIVER

JA358, JA366.  Although the dispatcher did not task him with the welfare check, Scott—who was finishing a traffic stop on the Ace Basin Parkway—"jumped the call" and proceeded to the river house.  JA366.

Around 5:20 p.m. on May 1—the same time he allegedly said he would harm himself, according to the CAD notes—Jerry accidentally dialed 911 from his cell phone.  JA545-546.  A CCSO dispatcher called Jerry back and asked if Jerry "had an emergency and everything was okay," and Jerry responded that everything was fine.  JA548-551.  Satisfied that Jerry was not in need of aid, the dispatcher recorded that the call was "settled by contact" and did not dispatch an officer to the river house.  JA548-551, JA545-546.  Thus, as Scott approached the river house, Jerry lay

4

in his bed having already conveyed his welfare to a law enforcement dispatcher two hours earlier.

The river house is a two-story house that sits on the west bank of the Edisto River at the end of a dirt road called Perkins Path. *See* JA259. The dirt-road approach leads to the south side of the house. *See* JA259. On the south side of the house is a concrete area with a covered carport. *See* JA259. The east side of the house faces the river, the north side of the house faces into a wooded area, and the west side of the house faces a small pond on the opposite side of the house from the river. *See* JA259.

As Scott approached the river house, he was equipped only with the information in the CAD notes. *See* JA366-367, JA358. Scott's actions during his approach to the river house and at the river house were captured on his body-worn camera, which reveals the following facts: when Scott arrived on the south side of the river house, a white pickup truck was parked neatly in the yard adjacent to the house. *See* JA Digital Media (4:04). Scott left his car parked in the yard without blue lights flashing and immediately approached a door on the south face of the house, which faced the carport, and knocked on the door. JA Digital Media (4:30–4:37); JA370-374. After receiving no answer, he walked up an exterior staircase to a second-story deck on the west side of the house facing away from the river, then walked back down the stairs without knocking on either sliding glass door leading

from the deck into the house. JA Digital Media (4:51–5:05); JA370-374. He returned to the door on the south face of the house and knocked again. JA Digital Media (5:07–5:13); JA370-374. Scott then approached a screen door on the south face of the house and peered in, before walking up another exterior staircase to a screen door on the second floor of the house near the river-side of the house. JA Digital Media (6:25–6:54); JA370-374. Scott knocked on the second-floor screen door, then retreated back down the stairs and returned to his car. JA Digital Media (6:56–8:08); JA370-374.

After moving his car and obtaining a flashlight, Scott again left his car without blue lights flashing and approached the house a second time. JA Digital Media (9:29); JA370-374. This time, he went to the first-floor screen door and knocked, then shined his flashlight through the screen to illuminate the interior of the house. JA Digital Media (9:32–9:47); JA370-374. Scott then walked around the east side of the house along the river to the north face of the house, shining his flashlight through the screen into the interior of the house as he walked. JA Digital Media (9:51–10:18); JA370-374. On the north side of the house, he walked through a covered porch and passed another screen door without knocking. JA Digital Media (10:20–10:31); JA370-374. Scott then walked back around the east side of the house from the direction he had come and walked up the exterior stairs to the second-floor screen door. JA Digital Media (10:32–11:05); JA370-374. From the landing at the

6

top of the stairs, he shined his flashlight through the screen and an adjacent window into the interior of the house.  JA Digital Media (11:07–11:34); JA370-374.

Scott then opened the screen door and made his first unlawful entry into the house.  JA Digital Media (11:36–11:39); JA370-374.  From inside a screened room on the second floor—the room was within the roof line of the house, contained a television and several items of furniture, and had two ceiling fans—he shined his flashlight through several glass doors leading further into the house.  JA Digital Media (11:42–13:33); JA370-374.  After approximately two minutes inside the house, Scott exited through the screen door and walked back down the exterior stairs.  JA Digital Media (13:33–13:49); JA370-374.  When he reached the bottom of the stairs, Scott paused at a window and shined his flashlight into a kitchen area on the first floor.  JA Digital Media (13:52–13:59); JA370-374.

Scott then returned to the first door he had approached on the south face of the house and opened the door without knocking.  JA Digital Media (14:05–14:20); JA370-374.  He announced "Sheriff's Office," used his flashlight to illuminate the room, and leaned partially through the doorway, thus making his second unlawful entry.  JA Digital Media (14:05–14:20); JA370-374.  Scott closed the door and walked back up the staircase leading to the deck on the second floor of the west face of the house.  JA Digital Media (14:20–14:36); JA370-374.  As he did so, he spoke into his radio, "Can you start animal control this way – I've got unsecured doors and

7

we're gonna have to secure a canine before we can clear the residence." JA Digital Media (14:28–14:36); JA370-374.

Once on the second-floor deck, Scott attempted to open a sliding glass door but found it was locked, so he knocked on the door with his flashlight. JA Digital Media (14:41–14:48); JA370-374. Scott then approached a second sliding glass door leading off the deck into an adjacent bedroom, opened the unlocked door, reached into the room to pull back some curtains and illuminate the bedroom with his flashlight, and leaned partially into the bedroom while announcing "Sheriff's Office"—thus making his third unlawful entry. JA Digital Media (14:55–15:44); JA370-374. Scott returned to the locked sliding glass door, knocked and announced "Sheriff's Office," then walked back down the staircase to the ground level. JA Digital Media (15:48–16:27); JA370-374.

Back on the ground level, Scott walked into a covered porch on the west side underneath the second-floor deck and shined his flashlight through a sliding glass door into a bedroom. JA Digital Media (16:32–16:53); JA370-374. He did not open that door, nor did he knock or announce himself. JA Digital Media (16:37–16:53); JA370-374. Scott then walked along the north face of the house to the covered porch he had passed through several minutes earlier. JA Digital Media (16:56–17:15); JA370-374. From the covered porch, he opened a screen door and made his fourth unlawful entry, this time into the first floor, while announcing "Sheriff's Office."

8

JA Digital Media (17:20–17:28); JA370-374.  The room he entered was a living space within the roof line of the house, which had screen walls on three sides and contained a pool table, two refrigerators, light fixtures, and numerous furniture items.  JA Digital Media (17:28–18:02); JA370-374.

Scott began searching the first floor.  JA Digital Media (17:28–18:16); JA370-374.  He walked to a bar inside the room and used his flashlight to illuminate a notebook on top of the bar.  JA Digital Media (17:32–17:57); JA370-374.  After a pause, Scott stated "Shit," then spoke into his radio, "Looks like I have a suicide note on the patio, we just can't get to one room until we get this dog secure."  JA Digital Media (17:41–18:28); JA370-374.  Around that time, another CCSO deputy, Lindsay Cummings, joined Scott inside the first floor.  JA Digital Media (18:14); JA370-374.  At various times throughout Scott's time at the river house, Jerry Crosby's Boykin spaniel can be heard barking as Scott approached and entered the screened rooms.  *See generally* JA Digital Media; JA370-374.

Scott exited the first floor, walked up the exterior stairs on the river-end of the house to the second floor, and made his fifth—and his final and fatal—unlawful entry through the screen door he had previously entered.  JA Digital Media (20:16–20:32); JA370-374.  From the second-floor screened living space, Scott charged into the interior of the house—unannounced and without knocking—with his gun drawn. JA Digital Media (20:36–20:50); JA370-374.  The sun had set, and the second floor

9

was dark except for a light coming through the doorway to a spiral staircase that led to the first floor. JA Digital Media (20:43); JA370-374; *see also* JA552. As Scott began searching the second floor by opening a hallway door (without announcing himself) with his gun drawn, he radioed to dispatch, "Clearing the residence, give me the channel." JA Digital Media (21:00–21:07). Scott proceeded down the dark hallway, which was illuminated only by a flashlight he carried, and—for the first time since he entered the second floor—announced "Sheriff's Office." JA Digital Media (21:07–21:10). The bedroom at the end of the hallway was dark; no lights were on in the room. JA Digital Media (21:08); JA552.

From the darkened bedroom, Jerry responded, "What can I do for you?" JA Digital Media (21:11–21:13). Scott asked, "Where are you at, man? This is the Sheriff's Office, are you okay?" JA Digital Media (21:13–21:18). Scott approached the doorway of Jerry's bedroom, shining his bright flashlight into the room. JA Digital Media (21:18–21:21). A mirror on the rear wall of the bedroom reflects Scott's approach in the body-worn camera video, but only the light from Scott's flashlight is visible. JA Digital Media (21:18–21:20); *see also* JA553-554. Scott is hidden in the darkness behind the bright light. JA Digital Media (21:18–21:20); *see also* JA553-554. Jerry responded to Scott, saying "I'm fine." JA Digital Media (21:21). Scott then took up position in the bedroom doorway and trained his flashlight on Jerry. JA Digital Media (21:23–22:05). Jerry, suddenly disturbed by

the mysterious man shining a flashlight in his face and blocking the exit, repeatedly told Scott to "Get out of my home." JA Digital Media (21:23–22:05). Scott refused to leave. JA Digital Media (21:23–22:05). Rather than explain why he was detaining Jerry, Scott vaguely stated "someone called in about you" and "we gotta check on you," asked Jerry whether he had taken any pills, and asked Jerry to "come out and talk to me real quick." JA Digital Media (21:23–22:05). When Jerry repeated his demand that Scott leave Jerry's home, Scott responded, "I'm not going to leave this door, so we just need to go outside and talk, and we can just handle this." JA Digital Media (21:23–22:05). During the entire exchange, Scott kept his bright flashlight trained on Jerry and remained hidden in the darkness behind the light. JA Digital Media (21:23–22:05).

Jerry then rose from his bed and walked to a bedroom closet where he kept a "snake gun" that his family used to protect themselves from moccasins and other river snakes. JA Digital Media (22:05–22:09); JA560-562. Scott took a step back into the hallway, remaining concealed in the darkness behind his flashlight beam. JA Digital Media (22:07–22:09); *see also* JA563. Jerry picked up the snake gun from the closet. JA Digital Media (22:10–22:13). The body-worn camera video does not show Jerry raising the snake gun toward Scott; it shows only that he picked it up from the closet and held it with the muzzle pointed down. JA Digital Media (22:10–22:13). Two seconds after Jerry picked up the snake gun, Scott opened fire

11

on Jerry, shooting him several times.   JA Digital Media (22:13–22:15).   Jerry

collapsed onto his own bed.  JA Digital Media (23:24–23:30).  EMS transported him

to the hospital, where he was pronounced dead.  JA368.

## IV.    The CCSO's Failure to Train Its Deputies

Welfare checks are "very common."  JA774.  Data maintained by the CCSO

shows that CCSO deputies conducted 533 welfare checks in 2022 and 604 welfare

checks in 2021.   JA774-778.   Thus, on average, the CCSO conducts one to two

welfare checks per day.

It is beyond dispute that police officers must be properly trained to avoid

infringing on citizens' constitutional rights.  *See, e.g.*, JA782-783.  Welfare checks

in which an officer attempts to make contact with a person at the person's home pose

a particular risk of constitutional violations due to the home's special treatment under

the Fourth Amendment.  *See, e.g.*, JA775.  Consequently, a law enforcement agency

like the CCSO must train its officers to conduct welfare checks at a person's home

without infringing on the person's constitutional rights.  JA775; *see also* JA289-298.

The CCSO has no written policy on welfare checks.  JA785.  Although it has

a policy on exigent circumstances and emergency searches, that policy states only

that "Immediate, warrantless entry is justified for the following: . . . to protect life

and safety."  JA791.

CCSO deputies go through several stages of training.  First, when they initially seek to become certified law enforcement officers, they go through basic training at the South Carolina Criminal Justice Academy.  JA793-794.  After obtaining a Class 1 certification from the Academy, deputies go through field training—known as the FTO program—at the CCSO.  JA795-796.  The FTO program is a ride-along training program in which a trainee learns to perform tasks in the field under the supervision of a field training officer.  *See* JA801-802.  The purpose of the FTO program is to produce a deputy who "can function by his or herself when doing their duties as a patrol officer."  JA802; JA789-790.  Deputies also receive in-service training on various topics, and they are periodically required to complete a certain number of continuing education training hours.  JA798-799, JA787-788 (listing the in-service training requirements).

According to Ricky Valentine, the CCSO's training lieutenant, the basic training curriculum at the Academy does not cover welfare checks.  JA795-797.  The Academy's basic training curriculum on searches also does not address the circumstances in which a deputy may make a warrantless entry into a person's home to render emergency aid.  *See generally* JA819-879 (showing Academy curriculum on searches).

The FTO program is governed by an FTO manual, which is effectively a syllabus for field training officers to follow with their trainees.  JA801-802.  The

FTO program does not cover welfare checks, JA800, and the FTO manual is devoid of any reference to welfare checks, *see generally* JA880-1071. The FTO manual also does not mention officers' authority to enter a home without a warrant to render emergency aid, *see generally* JA880-1071, and Lieutenant Valentine acknowledged that the FTO program does not cover the circumstances in which a deputy may make a warrantless entry into a person's home to render emergency aid, JA806-808.

The CCSO's in-service training likewise does not cover either topic. JA799-800. Finally, although some private vendors provide training to CCSO deputies, those vendors do not train deputies on these topics. JA817-818. Thus, the evidence shows that Scott received no training—and the CCSO and Sheriff Hill provide no training nor ensure that CCSO deputies receive any training from other sources—on welfare checks or the circumstances under which an officer may enter a person's home without a warrant to render emergency aid.

## V.    Procedural History

The Estate initiated this action in South Carolina state court on September 27, 2022. JA12-20. The defendants removed the case on November 4, 2022, based on federal question jurisdiction. JA8-9. After discovery closed, the defendants moved for summary judgment on all of the Estate's claims. JA42-63. The Estate also moved for summary judgment on its unlawful entry claim. JA299-322.

14

On December 27, 2023, the district court ruled on the summary judgment motions. JA1127-1147. It found Scott's entries into the river house and use of deadly force were objectively reasonable. JA1133-1140. It also found Scott was entitled to qualified immunity. JA1140-1143. Further, because it found Scott did not violate Jerry's constitutional rights, the district court found the Estate could not establish the predicate constitutional violation necessary to the Estate's *Monell* claim. JA1143-1145. Accordingly, the court granted summary judgment for the defendants on the unlawful entry, excessive force, and *Monell* claims and denied the Estate's motion for summary judgment. JA1127-1147. The district court remanded the state law claims. JA1145-1147. The Estate appealed. JA1148.

## SUMMARY OF ARGUMENT

Deputy Scott repeatedly violated Jerry Crosby's constitutional rights the night of May 1, 2022. Scott entered and searched Jerry's river house five times without a warrant or legal authority, depriving Jerry of the most sacred rights guaranteed by the Fourth Amendment of the United States Constitution and the right to privacy guaranteed by the South Carolina Constitution. On his fourth unlawful entry, he committed another constitutional violation—he searched Jerry's personal papers and effects, again without a warrant. On his fifth entry, which he made after unlawfully creating purported "exigent circumstances" by unconstitutionally searching Jerry's house, Scott "cleared" the house with his gun drawn like he was hunting a fugitive

15

(despite having been dispatched to check on Jerry's welfare) and confronted Jerry in the darkness. From a position of concealment behind a powerful flashlight, Scott insisted that Jerry "go outside" and "handle this." Exercising his constitutional, statutory, and common law rights, Jerry crossed the bedroom to a closet and picked up his family's snake gun. Two seconds later, while Jerry held the snake gun pointed downward, Scott committed at least his seventh constitutional violation—he shot and killed Jerry without justification for using deadly force.

No reasonable officer in Scott's position would have believed a genuine emergency existed requiring immediate entry into Jerry's house to save Jerry from imminent, serious harm. Nothing was amiss at the river house before Scott stormed inside with his gun drawn. Jerry's lack of response to Scott's knocks was nothing more than an exercise of his constitutional right to privacy under South Carolina law and his constitutional right not to respond to police. Jerry's actions inside his bedroom were nothing more than an exercise of his rights to arm himself and defend his home from a nocturnal trespasser. No reasonable officer would believe he had probable cause to use deadly force in these circumstances.

Perhaps none of these tragic constitutional violations would have occurred had the CCSO and Sheriff Hill properly trained their deputies on how to conduct a welfare check and on the parameters of their authority to enter a person's home without a warrant to render emergency aid. But the CCSO and Sheriff Hill did not

just fail to *properly* train their deputies in those areas; they failed to train their deputies in those areas at all.

Section 1983 "authorizes federal courts in civil rights cases to grant broad relief 'in equity, or other proper proceeding' and is designed to provide a comprehensive remedy for the deprivation of constitutional rights." *Smith v. Hampton Training Sch. for Nurses*, 360 F.2d 577, 581 (4th Cir. 1966). To state a claim under section 1983, a plaintiff must establish three elements: "(1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997). No genuine dispute exists regarding whether Scott is a "person" or was "acting under color of state law." The only issue is whether Scott, Sheriff Hill, and the CCSO deprived Jerry of a right secured by the Constitution or a federal statute—namely, Jerry's Fourth Amendment right to be free of unreasonable searches and seizures. They deprived Jerry of the most sacred of Fourth Amendment rights and his constitutional right to privacy. This Court should reverse each of the district court's summary judgment rulings and award summary judgment for the Estate on its unlawful entry claim.

## <u>STANDARD OF REVIEW</u>

This Court reviews a district court's summary judgment ruling de novo, "applying the same standard as the trial court and without deference to the trial

court." *Dash v. Mayweather*, 731 F.3d 303, 310 (4th Cir. 2013). Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In conducting its review, this Court must construe the evidence in the light most favorable to the non-moving party. *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218 (4th Cir. 2018). This Court does not weigh the evidence or make credibility determinations. *Id.*

## **ARGUMENT**

**I.    Scott violated Jerry's constitutional rights by making purported "emergency" warrantless entries despite lacking any objective signs that an emergency existed.**

The district court erred in granting Scott's motion for summary judgment on the Estate's unlawful entry claim and denying the Estate's motion. This Court should reverse both rulings.

South Carolina citizens have a constitutional right to be secure against unreasonable invasions of privacy. S.C. Const. art. I, § 10. Under the Fourth Amendment, a person's right to be free of unreasonable governmental intrusion into his home is entitled to a unique level of protection. *Florida v. Jardines*, 569 U.S. 1, 6 (2013). Police may take certain actions with respect to a person in public or with respect to a person's car that they cannot take with respect to a person's home. *See Caniglia v. Strom*, 593 U.S. 194, 199 (2021). The government's "physical entry of

the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980). Under the Second Amendment, a person has a right to own and carry firearms, particularly inside his own home in the night. U.S. Const. amend. II.

Despite these clear principles, the district court ignored multiple violations of Jerry's bedrock constitutional rights. Instead, the district court found that, because Scott was responding to a call for a welfare check (based on an allegation that Jerry "said he would harm himself" two hours earlier) and believed Jerry was home, it was "objectively reasonable" for Scott to enter Jerry's house and kill Jerry during a call in which Scott's job was to confirm Jerry's welfare without violating Jerry's constitutional rights. The district court ignored Scott's unconstitutional creation of purported exigent circumstances. This Court cannot sanction multiple constitutional violations and create precedent allowing police officers to storm a person's house with guns drawn and kill the person solely because the person exercised his constitutional rights to privacy, to be free of government officers invading his home without a warrant, and to carry firearms to protect himself and his home.

A. **The Court should reverse the summary judgment because genuine issues of material fact exist when the evidence is viewed in the light most favorable to the Estate.**

Any analysis of Scott's actions must begin with a bedrock rule of constitutional law: a police officer cannot lawfully enter a person's home without a

19

warrant. Although the courts have established certain exceptions to the bedrock rule, those exceptions are "jealously and carefully drawn," *U.S. v. Graham*, 686 F. App'x 166, 169 (4th Cir. 2017) (quoting *Jones v. U.S.*, 357 U.S. 493, 499 (1958)), and a police officer who relies on an exception bears a "heavy burden" to prove the exception renders his actions lawful, *see Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984). Thus, Scott's summary judgment motion must be analyzed according to this framework: first, all evidence and reasonable inferences from the evidence must be construed in the light most favorable to the Estate. If more than one conclusion can be drawn from the evidence, the Court must assume the conclusion that supports the Estate's claim. For example, if there are two reasonable explanations for the lack of response to Scott's knocks at the river house doors, the Court must assume the explanation that favors the Estate. Second, Scott's entries into Jerry's river house must be presumed unconstitutional unless Scott can prove—even with all evidence and inferences construed in favor of the Estate—that no reasonable jury could *disagree* with his claim that it was objectively reasonable for him to believe exigent circumstances required his immediate, warrantless entry into the river house.

> **i.    The emergency aid exception does not justify any of Scott's warrantless entries into the river house.**

Scott and the district court rely solely on the "emergency aid" exception to the warrant requirement—a subset of the exigent circumstances doctrine—as justification for Scott's warrantless entries into the river house. However, no

reasonable jury would find, based on the circumstances Scott faced, that it was objectively reasonable for Scott to believe an emergency existed requiring his immediate entry into the house.

Each of Scott's warrantless entries was per se unconstitutional. *See Mincey v. Arizona*, 437 U.S. 385, 390 (1978); *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Consequently, Scott must satisfy a "heavy burden" to prove the "emergency aid" exception justified the entries. *See Welsh*, 466 U.S. at 749–50; *Brigham City*, 547 U.S. at 403. Under this exception, an entry is justified only "if the officer had an objectively reasonable belief that an emergency involving danger to person or property required immediate entry," *United States v. Moss*, 963 F.2d 673, 674 (4th Cir. 1992), because a person in the house "is in need of immediate aid," *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (quoting *Mincey*, 437 U.S. at 392). In other words, it must be objectively reasonable for an officer to believe a genuine *emergency* exists in which *immediate* entry is required to render assistance to a *seriously injured* occupant or to protect an occupant from *imminent* injury. *See King*, 563 U.S. at 460; *Fisher*, 558 U.S. at 47; *Brigham City*, 547 U.S. at 403; *Mincey*, 437 U.S. at 392. This exception requires "that the circumstances present a *true 'emergency'*" and "is strictly construed—that is, an emergency must be 'enveloped by a sufficient level of urgency.'" *U.S. v. Curry*, 965 F.3d 313, 322 (4th Cir. 2020) (quoting *U.S. v. Yengel*, 711 F.3d 392, 397 (4th Cir. 2013)). Moreover, an officer's objectively reasonable

belief that an emergency existed requiring immediate entry "must be based on specific articulable facts and reasonable inferences that could have been drawn therefrom." *Yengel*, 711 F.3d at 397.

In analyzing any claim of exigent circumstances, this Court has "repeatedly found the non-exhaustive list of factors first provided in *United States v. Turner*, 650 F.2d 526, 528 (4th Cir. 1981), to be helpful in determining whether an exigency reasonably justified a warrantless search." *Yengel*, 711 F.3d at 397. Only one *Turner* factor—"the degree of urgency involved and the amount of time necessary to obtain a warrant"—applies to this case. *See id.*

The Supreme Court addressed the "emergency aid" exception in *Brigham City* and *Fisher*. The Court found exigent circumstances justified officers' entry into a person's home in both cases. Critically, in each case—and in other cases decided by this Court—the officers observed objective signs of distress or emergency from outside the homes before entering. In *Fisher*, police responded to a complaint of a disturbance near a home and received a report that a man was "going crazy." *Fisher*, 558 U.S. at 45. When police arrived at the house, they saw "a household in considerable chaos: a pickup truck in the driveway with its front smashed, damaged fenceposts along the side of the property, and three broken house windows, the glass still on the ground outside." *Id.* at 45–46. They also found "blood on the hood of the pickup and on clothes inside of it, as well as on one of the doors to the house."

*Id.* at 46.  Finally, from outside the house, they observed an individual inside the house, screaming and throwing things.  *Id.*  Based on those circumstances, the Supreme Court found "an objectively reasonable basis for believing" that medical assistance was needed or people were in danger.  *Id.* at 49.

In *Brigham City*, police responded to a report of a loud party at a house.  547 U.S. at 400–01.  When they arrived at the house, they heard shouting and, looking through a window near the back of the house, saw an altercation in which four adults were attempting to restrain a juvenile inside the home.  *Id.* at 401.  While police watched, the juvenile punched an adult in the face, causing the adult to spit blood. *Id.*  The Supreme Court found the officers "had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning."  *Id.* at 406.  Other cases have similarly focused on whether the police officers saw objective signs of an emergency prior to entering a home without a warrant, even where the officers were responding to a 911 call.  *See, e.g.*, *Bailey v. Kennedy*, 349 F.3d 731, 740, 743 (4th Cir. 2003) (finding "the police officers had no evidence to support the assertion in the 911 report that Michael was suicidal" and therefore "no exigent circumstances justified their warrantless entry into the Baileys' home"); *Moss*, 963 F.2d at 679 ("[T]here was nothing about the circumstances then confronting [the officer] (including his erroneous information) that warranted any perception of an emergency requiring immediate entry . . . .");

23

*U.S. v. Bustamante-Martinez*, 697 F. App'x 244, 245 (4th Cir. 2017) (finding the emergency aid exception applied where, among other things, officers observed the subject of a 911 call "looking out of the bedroom window with a rifle in hand" and "personally observed him to be intoxicated").[3]

In contrast with these cases, Scott did not observe any objective signs of distress or emergency at the river house. The 911 call alone cannot establish a genuine emergency requiring immediate, warrantless entry into the river house; rather, officers must observe some objective signs of an emergency that corroborates the 911 call before they are permitted to make a warrantless entry. *See Fisher*, 558 U.S. at 45–46, 49; *Brigham City*, 547 U.S. at 400–01, 406; *Bailey*, 349 F.3d at 740, 743; *Moss*, 963 F.2d at 679; *Bustamante-Martinez*, 697 F. App'x at 245; *see also, e.g.*, *U.S. v. Troop*, 514 F.3d 405, 410 (5th Cir. 2008) ("Without any objective evidence of physical distress, the failure of anyone to respond to the agents' knocking at the front and back doors of Troop's house also becomes insufficient to create exigent circumstances."). In fact, Deputy Cummings—the other CCSO officer on scene—conceded that the information received from dispatch did not give

---

[3] *Cf. Meyer v. McGowan*, No. 216CV00777RMGMGB, 2018 WL 4941134, at *10 (D.S.C. July 31, 2018) (finding exigent circumstances existed to justify officers' warrantless entry into a home where the officers responding to a 911 call found a bloody purse and high-heeled shoes in the yard outside the house), *report and recommendation adopted*, No. 2:16-CV-00777-RMG, 2018 WL 4300121 (D.S.C. Sept. 10, 2018).

deputies legal authority to enter the house. JA326. No reasonable officer (and, according to the testimony in this case, no reasonable CCSO deputy) would believe the facts before Scott were signs of distress or gave rise to a reasonable inference that urgent, immediate entry into the house was necessary or warranted.

The facts before Scott, for purposes of the defendants' summary judgment motion, are as follows: (1) Jerry's wife called 911 and asked for a welfare check because Jerry had said, two hours earlier, that he would harm himself; (2) Scott was at a house matching the description he received from dispatch; (3) a truck matching dispatch's description of Jerry's truck was parked next to the carport at the house; (4) a dog was barking inside the house; (5) nobody answered when Scott knocked on any of the doors to the house; (6) the lights inside the house were turned off except a single light on the spiral staircase that runs from the upstairs hallway to the downstairs kitchen area;[4] and (7) several doors to the house were unlocked. Scott saw no signs that anything was amiss or that Jerry was at imminent risk of bodily injury. Even if it may be reasonable to infer from the presence of the white pickup

---

[4] The district court's finding that the light was on in Jerry's bedroom, JA1130, illustrates its improper adoption of Scott's version of the evidence. Scott's body-worn camera video clearly shows that, as he moved through the upstairs living room and down the hallway, the second floor was dark except for the light from the spiral staircase. JA552; JA Digital Media (20:43–21:10). When Scott stood in the doorway, the bedroom was illuminated only by Scott's flashlight, which also obscured Scott from view, as can be observed from Scott's reflection in the bedroom mirror as he approached the doorway. JA553-554.

truck that Jerry was home, as the district court found, Scott saw no objective signs of distress, emergency, or injury before entering the house.  Thus, no reasonable officer would believe exigent circumstances required urgent entry into the river house to render "emergency aid" to Jerry.

Importantly, the Court must credit other reasonable inferences and explanations for the situation Scott encountered.  When Scott arrived at the river house, Jerry had numerous well-established rights, including constitutional rights to privacy and to be free of unreasonable searches and seizures, S.C. Const. art. I, § 10; U.S. Const. amend. IV; to own and store guns in his home, U.S. Const. amend. II; to ignore police officers knocking at his door, *King*, 563 U.S. at 469–70; and to defend his home or premises by using reasonable force to expel a trespasser, *State v. Rye*, 651 S.E.2d 321, 323 (S.C. 2007).  It is undisputed that he also had rights to leave his truck parked neatly next to his house, to allow his dog to bark at a stranger walking around the house, to leave doors to his home unlocked, and to have the lights in the home turned off while he was in bed after sunset.  *See King*, 563 U.S. at 469–70; *see also* JA405, JA422-424, JA413-414, JA416-418, JA408-409, JA393, JA428-429.

The only reasonable inference from the facts available to Scott is that Jerry was exercising these rights.  Because a citizen has a right not to answer the door when the police knock, Jerry's decision not to answer the door cannot reasonably be construed as a sign of distress or indicator of an emergency.  *See King*, 563 U.S. at

469–70; *see also, e.g.*, *Troop*, 514 F.3d at 410. Nothing is unusual or suspicious about a resident of a river house in a quiet, safe location, on a picturesque Spring evening, leaving his doors unlocked and allowing his dog to roam the house and bark. Reasonable, non-emergent explanations exist for Jerry's failure to quiet his dog: perhaps he simply did not mind his dog barking, did not want to stop his dog from barking at an unidentified stranger outside the house, or did not want to deal with the stranger knocking at his door and therefore exercised his right not to answer. Dogs routinely bark at strangers, visitors, and even familiar people outside their houses. Nothing is unusual about that. In light of all these facts and reasonable inferences to be drawn from these facts, a reasonable officer cannot assume or infer that Jerry was at ***imminent*** risk of dying inside the house when the officer saw no indication outside the house supporting that assumption. An emergency existed only if the officer (and the Court) assumes the worst possible inference—that the lack of response meant Jerry was at imminent risk of death or bodily harm. The Court cannot make that inference in light of Jerry's constitutional right to privacy, the law requiring objective signs of distress, and the standard of review requiring the Court to construe all reasonable inferences in favor of the Estate.

The facts available to Scott—viewed independently or as a "totality of the circumstances"—are not signs of distress, convey no degree of urgency, and do not indicate that any "genuine emergency" existed which required Scott to make

immediate entry into the river house to render assistance to a seriously injured occupant or to protect an occupant from imminent, serious injury. *See Fisher*, 558 U.S. at 45–56; *Brigham City*, 547 U.S. at 400–01; *King*, 563 U.S. at 470. A citizen's exercise of his own constitutional rights in response to an officer's attempt to conduct a welfare check cannot somehow create an "emergency" situation in which the officer has legal authority to enter the citizen's home without a warrant and "clear the residence." Donna Crosby's call for a welfare check did not create a situation in which Jerry Crosby no longer had a right to ignore the police knocking at his door. A reasonable officer cannot enter a person's home without specific articulable facts establishing that the person is at ***imminent*** risk of death or bodily injury. A third party's suspicions that a person may be suicidal might justify a knock at the door, but they do not create a reasonable belief that a person is at ***imminent*** risk of harm and therefore do not justify warrantless entry under the "emergency aid" doctrine. Even Scott acknowledged he was not intending to storm the second floor of the house before he found the purported suicide note and pills, which he found by violating Jerry's constitutional rights. JA191. Thus, the basis for his final entry was itself a constitutional violation.

Scott's actions were objectively unreasonable and contrary to clearly established law. Thus, at best, a jury must resolve questions of fact to determine whether it was reasonable for Scott to believe a genuine emergency required

immediate entry.  *See, e.g.*, *U.S. v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994) ("[I]f the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe.").[5]

### ii.     Scott entered the river house five times and conducted a Fourth Amendment search each time.

Scott entered the river house and conducted a Fourth Amendment search five times.  First, Scott entered the upstairs screened room overlooking the river.  JA Digital Media (11:36–11:39).  Second, Scott entered the bedroom on the south face of the house when he opened the exterior bedroom door and leaned into the room.  JA Digital Media (14:05–14:20).  Third, Scott entered an upstairs bedroom on the west side of the house when he opened a sliding glass door, reached into the room and pulled interior curtains aside, and leaned into the bedroom.  JA Digital Media (14:55–15:44).  Fourth, Scott entered the downstairs screened room, where he searched Jerry's personal papers and effects.  JA Digital Media (17:20–17:28).  Finally, Scott entered the upstairs screened room a second time before proceeding down the hallway to the bedroom and killing Jerry.  JA Digital Media (20:16–20:32).  Each of these entries was an unlawful and unreasonable entry and search under the Fourth Amendment.

---

[5] *See also, e.g.*, *Front Row Motorsports, Inc. v. DiSeveria*, No. 3:22-CV-00138-SCR, 2023 WL 5620757, at *7 (W.D.N.C. Aug. 30, 2023) ("[R]easonableness 'is a jury question except in the clearest cases . . . .'" (citation omitted)).

Four of Scott's unlawful entries occurred before he found the purported suicide note and pills in the downstairs screened room, which he relied on as justification for making the fifth and final entry into the second floor of the river house. Consequently, Court cannot consider the note and pills as evidence of exigent circumstances because Scott had already committed constitutional violations and found those items only as a direct result of his multiple unlawful entries and searches of the river house. Any purported exigency arising from Scott's unconstitutional discovery of the note and pills was a police-created exigency that cannot justify Scott's final unlawful entry into the second floor when he fatally shot Jerry. *See King*, 563 U.S. at 461.

Scott's actions in opening bedroom doors, leaning into the bedrooms, and looking around the bedrooms were entries into the home and searches under the Fourth Amendment. Similarly, the screened rooms in the river house were part of the home for Fourth Amendment purposes, and Scott's actions in walking into both rooms constituted entries into the home. *See U.S. v. Dunn*, 480 U.S. 294, 301 (1987) (explaining that in determining what constitutes the "home" for purposes of the Fourth Amendment, the relevant inquiry is whether the area in question "is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection"). The district court assumed, but did not decide, that the screened rooms were part of the home for purposes of the Fourth

30

Amendment analysis.  JA1128 n.1.  Regardless of whether the screened rooms are considered part of the home or curtilage, the Fourth Amendment analysis—and Scott's burden to prove exigent circumstances—is the same.  *See Jardines*, 569 U.S. at 5–6.

If the Court considers the status of the screened rooms, it should find they are part of the home.  Both screened rooms are living spaces that are fully enclosed by three screened walls, an interior wall, and the same roof that covers the rest of the home.  The upper screened room is a living space containing furniture, a television, and ceiling fans.  *See* JA397-398.  The lower screened room is a living space containing a pool table, a bar, two refrigerators, light fixtures, and several items of furniture.  *See* JA399-402.  To enter each screened room, Scott opened a screen door and walked through the doorway into the room.  Moreover, five law enforcement witnesses deposed in this case agreed that the screened rooms are part of the home and that Scott entered the home when he walked through the screen doors.  *See* JA405, JA329-330, JA410, JA419, JA424-425.  Scott himself even seemed to acknowledge that he entered the home when he entered the first-floor screened room and read the notebook lying on top of the bar.  *See* JA392.  Thus, the screened rooms are "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection."  *Dunn*, 480 U.S. at 301.

Any reasonable officer would understand that Scott's actions constituted five entries into Jerry's river house. No reasonable officer could believe he is allowed to enter a screened living space—which contained a pool table, multiple refrigerators, light fixtures, and other furniture and personal items and was within the roof line of the house—without entering the constitutionally protected home in doing so. Because Scott had no objectively reasonable justification for any of the entries, he unlawfully entered Jerry's river house five times. *See Jardines*, 569 U.S. at 5.

### iii. Scott's unlawful entries were a proximate cause of Jerry's death.

Although the district court did not address proximate case, a reasonable jury could find that Scott's unlawful entries were a proximate cause of Jerry's death. The only proximate cause issue in this case is whether Jerry's actions were a superseding cause. *See, e.g.*, *Kane v. Lewis*, 604 F. App'x 229, 240 n.3 (4th Cir. 2015) (Lewis, J., concurring in part and dissenting in part) ("Because violence in the wake of an unannounced home entry is eminently foreseeable, the standard for proximate cause is met unless the Officers can show the existence of a superseding cause that will insulate them from liability." (citing *Hudson v. Michigan*, 547 U.S. 586, 594 (2006))). "A cause can be thought 'superseding' only if it is a 'cause of independent origin that was not foreseeable.'" *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011); *see also Paroline v. U.S.*, 572 U.S. 434, 445 (2014) ("Proximate cause is often

32

explicated in terms of foreseeability or the scope of the risk created by the predicate conduct.").

On his final entry into the second floor of the river house, Scott did not knock and did not announce himself until forty seconds after entering the screen door, when he had already radioed that he was "clearing the residence," searched a closet, and prowled halfway down the dark hallway toward the bedroom—all with his gun drawn like he was trying to ambush a criminal suspect rather than check on Jerry's health or welfare.   JA Digital Media (22:30–22:10).   Regardless of Scott's announcement, it is foreseeable that when a police officer unlawfully enters a citizen's house in the night with his gun drawn and stalks down a dark hallway toward the citizen's bedroom—while concealed behind a powerful flashlight and dressed in clothing not readily identifiable as a police uniform—the citizen will fear for his life and exercise his constitutional right to arm himself in response to the intruder.  *See* U.S. Const. amend. II.  A reasonable jury could find it foreseeable and within the scope of risk created by Scott's unlawful entries that Jerry would react to the intruder—who he could not identify—by arming himself.  *See Paroline*, 572 U.S. at 445; Restatement (Second) of Torts § 442A ("Where the negligent conduct of the actor creates or increases the foreseeable risk of harm through the intervention of another force, and is a substantial factor in causing the harm, such intervention is not a superseding cause.").  Moreover, as will be explained below, Jerry's actions in

33

picking up the snake gun he lawfully kept in his bedroom closet did not justify Scott's use of deadly force. A reasonable jury could therefore find Jerry's actions were foreseeable and did not break the causal chain.

Proximate cause is generally a jury question. *See Small v. Pioneer Mach., Inc.*, 494 S.E.2d 835, 843 (S.C. Ct. App. 1997); *Mellen v. Lane*, 659 S.E.2d 236, 246 (S.C. Ct. App. 2008). The Court should leave the proximate cause question to the jury in this case.

### B. Even if the evidence is viewed in the light most favorable to Scott, his warrantless entries were objectively unreasonable.

This Court should reverse the district court's denial of the Estate's summary judgment motion on the unlawful entry claim because, even if the evidence and reasonable inferences are viewed in the light most favorable to Scott, no reasonable officer in his position would believe a "true emergency" existed requiring immediate entry into the river house. It cannot be disputed that Scott entered the house five times and that he did not find the purported suicide note and pills until after his fourth warrantless entry. The note and pills cannot justify Scott's final entry because he found them as a result of an unconstitutional entry and search. *See King*, 563 U.S. at 461.

The facts known to Scott are the same for purposes of the Estate's summary judgment motion: (1) the CAD notes from the 911 call; (2) the description of the house; (3) the truck; (4) the dog; (5) the choice not to answer the door; (6) the lights

switched off; and (7) the unlocked doors.  Even if reasonable inferences from those facts are drawn in Scott's favor, no objective signs of distress or emergency existed, no evidence indicated Jerry was dead or dying, and no reasonable officer could believe a genuine emergency existed that required immediate entry into the river house to save Jerry from imminent, serious harm.  *See Fisher*, 558 U.S. at 45–46, 49; *Brigham City*, 547 U.S. at 400–01, 406; *Bailey*, 349 F.3d at 740, 743; *Moss*, 963 F.2d at 679; *Bustamante-Martinez*, 697 F. App'x at 245; *see also, e.g.*, *Troop*, 514 F.3d at 410.

Because Jerry had a right not to respond or answer the door when a police officer knocked, it is unreasonable for an officer to infer—in the absence of any objective signs of distress outside the house—that the lack of response is a sign that Jerry required immediate, emergency aid.  *See id.*  Similarly, because it is undisputed that Jerry had a right to leave his doors unlocked, to allow his dog to bark, to park his truck next to his house, and to turn off the lights in his house, those facts cannot cause a reasonable officer to believe an emergency existed, even if they are considered in conjunction with the 911 call under a "totality of circumstances."  *See id.*; *King*, 563 U.S. at 469–70; *see also* JA405, JA422-424, JA413-414, JA416-418, JA408-409, JA393, JA428-429.  If those facts justify a warrantless entry under the Fourth Amendment, the majority of homes in the South and elsewhere—especially homes in rural areas where residents often have dogs, pickup trucks, and firearms

and leave their doors unlocked—would lose bedrock Fourth Amendment protections and the right to privacy any time a third party called 911 and asked for a welfare check on a resident or suggested the resident might harm himself. Further, Scott's unlawful entry was the proximate cause of Jerry's death, *see* Part I.A.iii, *supra*, and Scott is not entitled to qualified immunity, *see* Part III, *infra*. Accordingly, this Court should reverse the district court and direct that summary judgment be entered in favor of the Estate on its unlawful entry claim.

## II. A reasonable jury could find that Jerry's actions in picking up the snake gun to defend his home from a nocturnal intruder, but not pointing the gun at the intruder, did not justify Scott's use of deadly force.

The district found it was objectively reasonable for Scott to kill Jerry during a call that was supposed to be a welfare check. However, construing the evidence in the light most favorable to the Estate, a reasonable juror could find it was not objectively reasonable for Scott to believe he had probable cause to use deadly force against Jerry. The district court therefore erred in granting summary judgment, and its ruling should be reversed.

This Court has noted the "special difficulties" that arise at summary judgment in cases like this, because Scott "killed the only other potential witness" to his use of force who can directly refute his account of what happened. *Stanton v. Elliott*, 25 F. 4th 227, 234 (4th Cir. 2022); *Knibbs v. Momphard*, 30 F. 4th 200, 216 (4th Cir. 2022). The Court therefore emphasized the need to "be careful at summary

judgment to avoid simply accepting an officer's self-serving statements" and to "consider all contradictory evidence." *Stanton*, 25 F. 4th at 234; *see also Knibbs*, 30 F. 4th at 216 ("Without [the victim's] account, it can 'be easy to overvalue the narrative testimony of [the officer] and to undervalue potentially contradictory physical evidence.'" (citations omitted)).

An officer may use deadly force under the Fourth Amendment when he has probable cause to believe a "suspect posed an immediate threat to the safety of the officers or others." *Knibbs*, 30 F. 4th at 214 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).[6] Probable cause to use deadly force exists only if it is "'objectively reasonable in light of the facts and circumstances confronting [the officer], viewed in the light most favorable to the [Estate], without regard to the [officer's] underlying intent or motivation.'" *Id.* (second alteration in original).

This Court held summary judgment was improper under similar circumstances in *Knibbs*. 30 F. 4th at 216. The Court found a "holistic review of the record" reflected "at least two genuinely disputed and material facts"—whether the victim aimed his gun at the police officer and whether the officer was "readily recognizable as a law enforcement officer." 30 F. 4th at 216. In *Knibbs*, a police officer went to a citizen's house not to arrest the citizen but to investigate a dispute between neighbors. *Id.* The officer, while standing on the citizen's darkened porch,

---

[6] The other *Graham* factors—"the severity of the crime" and "whether [the suspect] is actively resisting arrest or attempting to evade arrest" do not apply to this case. *See* 490 U.S. at 396.

shot the citizen in his own home because the citizen had picked up and "racked" a shotgun to "investigat[e] a nocturnal disturbance on his own property." *Id.* at 219 (alteration in original).  The officer had announced himself, but there was no evidence that the citizen could discern who was outside on his porch, and the Court noted the citizen's statement that "anybody can say they are a sheriff." *Id.* at 209, 219.  Because the Court was considering the officer's summary judgment motion, it credited the plaintiff's evidence that the citizen had not pointed the shotgun at the officer. *Id.* at 219.

Based on those facts, the Court found that a reasonable officer would have recognized the citizen may not be able to discern who was on his porch and that the citizen had a right to come to the door with a firearm, which was a "perfectly reasonable" action because "'the need for defense of self, family, and property is most acute' in one's home." *Id.* at 209, 219; *see also Betton*, 942 F.3d at 192 (finding a genuine issue of material fact whether a citizen shot by police in his own home, while holding a handgun, had pointed the handgun at police); *Cooper v. Sheehan*, 735 F.3d 153, 157–59 (4th Cir. 2013) (finding a district court properly denied officers' motion for summary judgment where "the totality of the circumstances [did] not establish that [the Officers] had probable cause to believe that [Cooper] was dangerous when [he] stepped onto his unlit porch at 11:30 p.m., holding a shotgun pointing down, asked who was there, heard nothing, and then was shot a

few seconds later" (alterations in original)); *Pena v. Porter*, 316 F. App'x 303, 312 (4th Cir. 2009) ("Pena's decision to bring his gun when he went outside in the middle of the night after being awoken by the sound of his dogs barking and the squawking emanating from his chicken coops was perfectly reasonable, and this should have been apparent to the Officers at the time of the shooting.").

The evidence in this case is similar to the evidence in *Knibbs*, *Betton*, *Cooper*, and *Pena*. Viewing the evidence and all reasonable inferences in the Estate's favor, Scott approached Jerry at night in a dark hallway inside Jerry's house—after having unlawfully trespassed into the house—and was obscured from Jerry's view by the flashlight he aimed in Jerry's face. JA Digital Media (21:18–21:20); JA553-554 (showing Scott obscured behind his flashlight beam in the bedroom mirror). Scott was not wearing a traditional police uniform, but instead wore tan pants and a black shirt and vest that said "SHERIFF" only on a small patch with dark lettering. *See* JA1072. Scott identified himself as the "Sheriff's Office," but a reasonable jury could find that Jerry could not identify who was standing in his bedroom doorway claiming to be the "Sheriff's Office" and insisting that Jerry "go outside" and "handle this." *See Knibbs*, 30 F. 4th at 219 ("[A]n officer's announcement of his presence is not dispositive in assessing whether an officer reasonably feared for his or her life before using deadly force. Rather, it must be considered under the totality of the circumstances.").

39

Jerry, unaware whether the trespasser behind the flashlight was a police officer or a burglar, walked to his bedroom closet and picked up the snake gun that he rightfully keeps in his house for the protection of his family. JA Digital Media (22:05–22:09). Thus, as is his right, Jerry armed himself in case he needed to defend himself and his home. *See Knibbs*, 30 F. 4th at 219; *Rye*, 651 S.E.2d at 323; U.S. Const. amend. II. Although an important question in evaluating an officer's use of force is whether an individual's "movements while holding the firearm . . . objectively indicate that he imminently plans to use it to harm the officers or a third party" *id.*, the body-worn camera footage, viewed in the light most favorable to the Estate, does not show Jerry pointing the snake gun at Scott. Even the enhanced still frames from the video included in the South Carolina Law Enforcement Division ("SLED") report do not show Jerry pointing the snake gun at Scott. *See* JA1073-1076. On the contrary, SLED's "enhanced" still frame depicting the moment immediately before Scott began shooting Jerry clearly shows Jerry pointing the muzzle at the floor. JA1076.

Factual disputes about whether Jerry knew Scott was a police officer and whether he handled the snake gun in a threatening manner are "quintessentially 'genuine' and 'material.'" *Knibbs*, 30 F. 4th at 215. The Court must credit the Estate's evidence that Jerry picked up the snake gun but did not threaten Scott with it nor point it at Scott. *Id.* at 218. The Court must also credit the evidence—shown

40

in Scott's body-worn camera video—that Scott was hidden in the darkness behind a bright flashlight and that Jerry could not identify whether Scott was a police officer.

The district court disregarded these factual disputes whether Jerry knew Scott was a police officer and whether Jerry pointed the snake gun at Scott, instead crediting Scott's construction of the body-worn camera footage. The district court repeatedly assumed that Jerry "pointed the firearm at Officer Scott" and "angrily retrieved a firearm from his bedroom closet and aimed it directly at the officer." JA1138-1139. The district court also improperly speculated that Scott "was readily identifiable as a police officer" and that Jerry "knew he was talking to a police officer" but ignored evidence to the contrary. JA1138-1139. However, like all citizens exercising their constitutional rights, Jerry knew the police could not enter his home without a warrant and, therefore, had no reason to believe the trespasser in his home holding a flashlight in his face, refusing to leave despite Jerry's demands that he leave Jerry's house, and demanding that he go outside was a police officer. Jerry's own actions—demanding that the trespasser "get the hell out of my home" and, when the trespasser claiming to be a police officer refused to leave despite having no legal authorization to be in the home, walking to his bedroom closet to exercise his constitutional right to pick up the snake gun—demonstrate that he did not know or believe the trespasser was a police officer. Rather than credit these reasonable inferences, the district court adopted Scott's argument that "Mr. Crosby's

words or tone of voice were not those [of] a man greeting a trespasser or a man defending his home." JA1139. The district court's conclusions are contradicted by evidence in Scott's body-worn camera video. It therefore erred in making those inferences. This Court should not follow suit in ignoring Jerry's constitutional rights and evidence supporting the Estate's claims.

Further, a reasonable officer conducting a welfare check by entering a rural home at night without a warrant should expect that he will encounter an armed homeowner. When Scott entered the river house, he was not readily identifiable as a police officer, and the blue lights on his car parked in the yard were not flashing. Jerry had no indication that Scott was the "Sheriff's Office" as he claimed to be. A reasonable officer would understand this situation, would know he was violating Jerry's constitutional rights, and would not reasonably feel threatened by the resident arming himself consistent with his constitutional rights.

Under these circumstances, a reasonable jury could find Jerry was shot "only because he was holding a gun, although he never raised the gun to threaten" Scott. *Knibbs*, 30 F. 4th at 218; *see also id.* at 222 ("[T]here is a line that our case law has drawn between lawfully possessing a firearm for self-defense in one's own home, and possessing a firearm . . . in a manner that objectively threatens an officer's life or the life of another person. Under the totality of the circumstances as proffered by the [plaintiff], a reasonable officer would have recognized that there was no

42

imminent threat to his life simply because [the decedent] refused to drop a loaded shotgun that he was pointing safely towards the ceiling while standing inside his own home peering onto his unlit porch to investigate a nocturnal disturbance."). The same reasonable jury, viewing the facts objectively, could find it unreasonable for an officer in Scott's position to believe he was threatened in a manner that gave him probable cause to use deadly force in response. And if Scott's use of force was unconstitutional, then the excessive force was clearly a proximate cause of Jerry's death. *See Small*, 494 S.E.2d at 842.

Regardless of the above analysis, when Scott made contact with Jerry inside the house and Jerry responded that he was "fine" and that Scott should "get out of my home," any purported emergency was over. It was obvious that Jerry (who was resting in bed, under the covers) was not dead and was not at imminent risk of bodily harm. Scott's job to check on Jerry's welfare had been accomplished, albeit by repeatedly violating Jerry's constitutional rights. Scott could have, and should have, left the river house at that point. Instead, having confirmed Jerry's welfare, he refused to leave and caused a confrontation in which he—in an act repugnant to the purpose of a welfare check—killed Jerry. Genuine issues of material fact exist on the Estate's excessive force claim, and this Court should reverse the granting of summary judgment.

III.   **Scott is not entitled to qualified immunity because genuine questions of material fact exist regarding the reasonableness of his actions, and Scott cannot prove Jerry's rights were not clearly established.**

Scott is not entitled to qualified immunity.  This Court applies a two-step test to a qualified immunity defense: first, the Court must determine whether the facts viewed in the Estate's favor make out a violation of Jerry's constitutional rights; and second, the Court determines whether the violated right was clearly established at the time. *Stanton*, 25 F. 4th at 233.  The Estate bears the burden of proof on the first prong, and Scott bears the burden of proof on the second prong. *Id.*  At the summary judgment stage, under either prong of the analysis, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."  *Ray v. Roane*, 93 F.4th 651, 658 (4th Cir. 2024).

The district court found Scott was entitled to qualified immunity on the Estate's unlawful entry claim because "it would not be clear to a reasonable officer that entering a home in this situation is unlawful" and on the excessive force claim because "it would not be clear to a reasonable officer that using deadly force in this situation is unlawful."[7]   JA1141-1142.   The district court's rulings should be reversed.  For the reasons explained above, the Estate has satisfied its burden to make out violations of Jerry's constitutional rights.  Because, at best, genuine questions of

---

[7] The district court's qualified immunity ruling on the excessive force claim, like its other rulings, was tainted by its finding that Jerry pointed the snake gun at Scott despite a lack of clear supporting evidence in the video.

44

material fact exist regarding the reasonableness of Scott's actions, he is not entitled to summary judgment on qualified immunity and this Court's analysis should end there. To the extent the Court considers the second prong of qualified immunity, Scott has not shown and cannot show that Jerry's rights were not clearly established.

A citizen's right is "'clearly established' when the contours of the right are sufficiently clear to ensure that a 'reasonable official' would have understood that the alleged conduct was unlawful." *Betton*, 942 F.3d at 193 (citations omitted). However, courts "'do not require a case directly on point' . . . to conclude that the law was clearly established." *Livingston v. Kehagias*, 803 F. App'x 673, 679 (4th Cir. 2020) (citations omitted). Instead, "[w]hat matters is that it 'would be clear to a reasonable officer that his or her conduct was unlawful in the particular situation that he or she confronted.'" *Id.* (citations omitted). In certain "obvious cases," general rules are sufficient to "clearly establish" a person's rights. *See Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017). There need not be binding precedent on the exact factual scenario Scott confronted for the law to be clearly established. *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 398 (4th Cir. 2014) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held [to be] unlawful."). Officers "'can still be on notice that their conduct violates established law even in novel factual circumstances,' so long as the law provided 'fair warning' that their

45

conduct was unconstitutional." *Booker*, 855 F.3d at 538 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002))).

Jerry's rights were "clearly established" at the time of Scott's unlawful entry into Jerry's house, and the second prong of the qualified immunity analysis therefore weighs in favor of the Estate. The 911 call does not establish exigent circumstances, and the facts observed by Scott at the river house gave no indication that any emergency existed. *See Fisher*, 558 U.S. at 45–56; *Brigham City*, 547 U.S. at 400–01; *Bailey*, 349 F.3d at 740, 743; *Moss*, 963 F.2d at 679; *Bustamante-Martinez*, 697 F. App'x at 245. The case law is clear—in the absence of objective signs of distress and need for urgency, no reasonable officer would believe a genuine emergency existed. *See id.*; *see also Caniglia*, 593 U.S. at 199 (rejecting the theory that police may enter a person's home to perform their community caretaking functions). Any reasonable officer in Scott's position would know from these clearly established principles that he was violating Jerry's constitutional rights.

Consistent with established law, Deputy Cummings testified in her deposition that she and Scott had lawful authority only to knock on the door and attempt to make contact with Jerry and explained "if we don't see anything that is concerning or believe that we need to enter for emergency situations, then we leave." JA328. Thus, the law is clearly established. Scott is not entitled to qualified immunity on the Estate's unlawful entry claim.

46

Finally, Scott is not entitled to qualified immunity on the Estate's excessive force claim because a reasonable jury could find it was unreasonable for an officer in Scott's position to believe he was threatened in a manner justifying the use of deadly force in response, and the law governing Jerry's rights and Scott's actions under these circumstances is clearly established by *Knibbs*, *Betton*, *Cooper*, and *Pena*. *See* Part II, *supra*; *Betton*, 942 F.3d at 193–94 ("The key inquiry in this regard is not whether one of these courts has considered identical factual circumstances and held that an officer's conduct violated particular constitutional rights.  Instead, we consider whether officers within our jurisdiction have been provided fair warning, with sufficient specificity, that their actions would constitute a deprivation of an individual's constitutional rights.").  Accordingly, this Court should reverse the district court's finding that Scott is entitled to qualified immunity.

## IV.  A reasonable jury could find the CCSO and Sheriff Hill liable under *Monell* because Jerry's death was a highly predictable consequence of their failure to train CCSO deputies on welfare checks and the emergency aid exception.

The district court granted summary judgment on the Estate's *Monell* claim solely on the ground that the Estate could not establish a predicate constitutional violation by Scott.  JA1144.  For the reasons stated above, this Court should reverse the district court's finding.  Moreover, viewing the evidence in the light most favorable to the Estate, the CCSO and Sheriff Hill did not train CCSO deputies on how to conduct a welfare check nor on the parameters of deputies' authority to enter

a person's home under exigent circumstances to render emergency aid. A reasonable jury could therefore find the CCSO and Sheriff Hill liable under section 1983 based on those training deficiencies. Consequently, a genuine issue exists for trial on the Estate's *Monell* claim.

A municipality "may be liable for a plaintiff's constitutional harms pursuant to § 1983" when the constitutional harms are caused by the official actions of "those whose edicts or acts may fairly be said to represent official policy." *See Monell*, 436 U.S. at 690, 694; *Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 522–23 (4th Cir. 2000). *Monell* liability "attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Riddick*, 238 F.3d at 523. A "final policymaking official" has "the responsibility and authority to implement final municipal policy with respect to a particular course of action." *Id.*

Inadequate police training may form the basis for section 1983 liability "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact," *City of Canton v. Harris*, 489 U.S. 378, 388 (1989), and the plaintiff can show "a direct causal link between the municipal action and the deprivation of federal rights." *Riddick*, 238 F.3d at 524 (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997)). Although in some cases a pattern of similar constitutional violations by untrained employees is

48

required to show continued adherence to an approach that the policymaker knows has failed to prevent tortious conduct, a pattern is not necessary in all cases.  Rather, the Supreme Court has noted that "in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Brown*, 520 U.S. at 409–10.  As an example, the Supreme Court explained that "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons" and arm their officers with firearms "in part to allow them to accomplish this task." *City of Canton*, 489 U.S. at 390 n.10.  "Thus, the need to train officers in the constitutional limitations on the use of deadly force, can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Id.*

Sheriff Hill's and the CCSO's failure to train deputies on welfare checks and the parameters of deputies' authority to enter a person's home without a warrant to render emergency aid is analogous to the Supreme Court's example in *City of Canton* and is deliberate indifference which renders them liable under section 1983.  Sheriff Hill is the final policymaking authority for the CCSO and has a duty to ensure CCSO deputies are properly trained.  JA771-773.  Welfare checks are "very common" tasks for CCSO deputies, who collectively conduct an average of one or two welfare checks per day, every day.  JA774-780.  Thus, a welfare check—a situation in which

49

a police officer approaches a citizen's home to attempt to "make contact" with a citizen and confirm the citizen's welfare—is an oft-recurring situation for CCSO deputies.

CCSO policymakers "know to a moral certainty that their police officers will be required to" conduct welfare checks and confront scenarios in which they must decide whether exigent circumstances require them to immediately enter a citizen's home to render emergency aid. *See City of Canton*, 489 U.S. at 390 n.10. If deputies are not trained how to conduct a welfare check without infringing on a person's constitutional rights and on the parameters of their authority to enter a person's home to render emergency aid, an "obvious" and "highly predictable consequence" is that deputies will violate people's constitutional rights. *See Brown*, 520 U.S. at 409–10; *City of Canton*, 489 U.S. at 390 & n.10; JA775.

The failure to train CCSO deputies in these areas is "properly . . . characterized as 'deliberate indifference' to constitutional rights." *City of Canton*, 489 U.S. at 390 n.10. This failure to train caused Jerry Crosby's death. If Scott had been properly trained on how to conduct a welfare check and the circumstances under which he can enter a person's home to render emergency aid, he would not have entered Jerry's river house on May 1, 2022, and therefore would not have killed Jerry while purportedly checking on Jerry's health and welfare. *See City of Canton*,

489 U.S. at 391; *see also* JA289-298.  Accordingly, this Court should reverse the district court's granting of summary judgment on the Estate's *Monell* claim.

## CONCLUSION

This Court should reverse the district court's summary judgment rulings and award summary judgment in favor of the Estate on its unlawful entry claim, and the case should be remanded for further proceedings.

## REQUEST FOR ORAL ARGUMENT

Appellant requests oral argument and respectfully submits that it would significantly aid the decisional process in resolving the important issues presented regarding police officers' authority to enter a citizen's home to render emergency aid and use of deadly force inside a person's home while conducting a warrantless welfare check, and in addressing the numerous disputes of material fact at issue in this appeal.

Respectfully submitted,

*s/ Nicholas A. Charles*

Nicholas A. Charles
W. Mullins McLeod, Jr.
McLEOD LAW GROUP, LLC
P.O. Box 21624
Charleston, South Carolina 29413
Phone: (843) 277-6655
Fax: (843) 277-6660
nick@mcleod-lawgroup.com
mullins@mcleod-lawgroup.com

*Attorneys for Appellant Colby*
*William Crosby, as the Personal*
*Representative of the Estate of*
*William Jerry Crosby*

Dated: April 4, 2024

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g)(1), I hereby certify that this Opening Brief complies with the type-volume requirements set forth in Rule 32(a)(7)(B)(i), because it contains 12,813 words, excluding the parts of the brief exempted by Rule 32(f).

I further certify that this Opening Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it was prepared in a proportionally-spaced typeface using Microsoft Word in Times New Roman 14-point font.

*s/ Nicholas A. Charles*
Nicholas A. Charles
